[Cite as *Kademian v. Marger*, 2014-Ohio-4408.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

MICHAEL T. KADEMIAN, M.D.          :

    Plaintiff-Appellant          :          C.A. CASE NO.    25917

v.          :          T.C. NO.    02-CV-2576

DONALD MARGER, M.D., et al.          :          (Civil appeal from
                                               Common Pleas Court)

    Defendant-Appellees          :

           :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____3rd____ day of ____October____, 2014.

. . . . . . . . . .

JAMES M. HILL, Atty. Reg. #0030633, James M. Hill Co., L.P.A., 2365 Lakeview Drive, Suite A, Beavercreek, Ohio 45431-3696
    Attorney for Plaintiff-Appellant

FELIX J. GORA, Atty. Reg. #0009970, Rendigs, Fry, Kiely & Dennis, 600 Vine Street, Suite 2650, Cincinnati, Ohio 45202-3688
    Attorney for Defendant-Appellees

. . . . . . . . . .

DONOVAN, J.

{¶ 1}     This matter is before the Court on the Notice of Appeal of Michael T. Kademian, M.D.,filed September 19, 2013.  Kademian appeals from the December 20, 2012 Verdict Entry of the trial court, issued following trial at which a unanimous jury found in

favor of Appellee Donald Marger, M.D., on Kademian's claims for breach of fiduciary duty and conversion. Kademian also appeals from the August 20, 2013 Decision of the trial court that overruled his motions for judgment notwithstanding the verdict and for a new trial. We hereby affirm the judgment of the trial court.

{¶ 2} The lengthy factual history herein is set forth in this Court's March 9, 2012 Opinion reversing the decision of the trial court and remanding the matter on Kademian's direct appeal from the trial court's decision entering summary judgment in favor of Marger on Kademian's claims for conversion and tortious interference, and granting Marger's motion for a directed verdict, at the close of Kademian's case, on Kademian's claim of breach of fiduciary duty. *Kademian, M.D. v. Marger*, *M.D.*, 2d Dist. Montgomery No. 24256, 2012-Ohio-962 (*"Kademian I"*). Therein this Court noted that in ruling on Kademian's appeal, it "construed the transcripts of testimony and documents admitted at the conclusion of Dr. Kademian's case most strongly in Dr. Kademian's favor." *Id.*, ¶ 5. This Court set forth the following facts:

> * * * Donald Marger, a radiation oncologist, formed [Marger and Associates ("M & A")] in 1983, for the purpose of practicing medicine. At the time, Marger was the sole shareholder in M & A. In 1983, Marger also began an association with Good Samaritan Hospital in Dayton, Ohio, and continued to practice radiation oncology at Good Samaritan until June 30, 2000.
>
> Michael Kademian was also a radiation oncologist and became employed by M & A in January 1990. At the time, Marger had been working

at St. Elizabeth's Hospital (later known as Franciscan Hospital), and at Good Samaritan. After Kademian became employed, the two doctors each spent one-half day at each hospital, switching locations at noon.

The following year, in January 1991, Kademian purchased 49% of the corporate shares, paying $2,500 as a down payment, and signing a promissory note for the remainder of the cost. The book value of the shares was derived by subtracting the assets from the liabilities and multiplying that amount by 0.49. The total price listed in the stock purchase agreement was $10,851.

In April 1992, both Marger and Kademian signed Amended and Restated Employment Agreements with M & A. The agreements are essentially identical, and in Paragraph 5, prohibit Marger and Kademian from engaging "in the practice of medicine, specifically therapeutic radiology, except as an Employee of the Employer unless otherwise authorized by the Board of Directors." * * * .

Paragraph 9 of the agreements also contains a non-competition clause, which provides that:

9. *Non-Competition*. Without the express written consent of the Employer, the Employee shall not directly or indirectly own, manage, operate, join, control or participate in the ownership, management, operation or control of or be connected in any manner with the speciality practice of therapeutic radiology other than pursuant to the terms of this

Agreement.

Upon termination of employment, the Employee covenants and agrees that except for the prior written consent of the Employer, the Employee will not engage in the practice of the speciality of therapeutic radiology, in any way, in St. Elizabeth's Hospital or Good Samaritan Hospital, both of Dayton, Ohio, nor with any other venture involving any hospital or institutions with which the Employer is or shall be associated, nor with any independent or free-standing facility within a geographic radius of ten (10) miles of St. Elizabeth or Good Samaritan Hospital, Dayton, Ohio. Such restrictions shall continue for a period of two (2) years from and after the termination of employment or existence of the Corporation or any successor thereto, including the death or retirement of the remaining shareholders of Employer, whichever time is shorter. * * *.

Marger and Kademian continued to practice together for a number of years, performing radiation oncology services at Good Samaritan and at St. Elizabeth's Hospital. Good Samaritan was an "open hospital," which allows any radiation oncologist to obtain privileges and treat at the facility, because the hospital does not have an exclusive agreement with any one person or group. M & A had a strong relationship with Good Samaritan, as evidenced

by the fact that Marger was the medical director of radiation oncology at Good Samaritan at the time of the events giving rise to the current litigation. Kademian had also been the medical director at Good Samaritan.

Around 1985, Dr. Robert Field was appointed as the medical director of radiation oncology at Miami Valley Hospital, a third hospital located in Dayton, Ohio. Field continued as medical director, and his group had an exclusive contract to practice radiation oncology at Miami Valley, between 1985 and the summer of 2000. This meant that only doctors in Field's group could treat patients in the radiation oncology department. Other doctors could be on staff at Miami Valley, but would not be allowed to treat patients in the department.

In 1995, Premier Health Partners was formed, joining Miami Valley and Good Samaritan in one holding company. Miami Valley was a 60% shareholder and Good Samaritan was a 40% shareholder in Premier Health. In 1997, Miami Valley and Good Samaritan hired consultants to evaluate their oncology programs. The consultants recommended, in late 1997, that Good Samaritan and Miami Valley integrate their radiation oncology programs. Administrators at both Good Samaritan and Miami Valley encouraged Field's group and M & A to merge. Consequently, in early 1998, Marger formed a limited liability company with Field's group. This was done over the objections of Kademian, who was concerned about Field's abilities as a physician. At least as early as 1994, Miami Valley also had concerns over

Field's leadership and clinical practice. In 1994, Miami Valley's chief operating officer (COO) required Field to prepare a corrective action plan for the business and clinical practice. Miami Valley did not think much of Field as a clinician, felt Field had a slipshod approach to medicine, and was continually attempting to get Field to improve. Kademian was aware of Field's reputation prior to the merger discussions, and told Marger he did not believe Field was a good doctor.

Another issue with Field was that in 1997, the Ohio Department of Health had established a requirement that medical directors of radiation oncology must be certified by the American Board of Radiology (ABR). Field was not certified by ABR. Kademian had been board-certified by ABR for many years, and was appointed medical director of radiation oncology at Good Samaritan in May 1997. Kademian notified Good Samaritan (which at that time was part of Premier Health), about Field's lack of appropriate certification, but Field remained director at Miami Valley. The issue of Field's lack of board certification resurfaced during the merger discussions.

During 1998, Kademian received courtesy staff privileges at Miami Valley and began investigating Field's certification status. After Kademian called the president of Premier Health about Field's lack of ABR certification, Field was removed as medical director and was replaced by his associate, Dr. Duncan.

Also in 1998, ill will began to develop between Marger and Kademian

as a result of the proposed merger and Marger's sale of Western Ohio stock that was owned by M & A. Marger received the entire distribution from the sale, rather than allocating 49% of the proceeds, approximately $60,000, to Kademian. At one point, Marger stated that he wanted to "get rid" of Kademian. In addition, Kademian testified that he had learned during discovery of a prediction Marger had made in July 1998, to M & A's corporate attorney. The prediction was that Kademian was going to be removed as medical director at Good Samaritan. This "prediction" came true. In early September 1998, Kademian was removed as medical director over an incident involving a hearing aid that a nurse had misplaced at work. Kademian contended that the matter was trivial and was not grounds for removal.

Marger was appointed as medical director of radiation oncology at Good Samaritan about a week after Kademian was removed. Between October and December 1998, Kademian and Marger discussed the possibility of Kademian leaving M & A, due to these issues, but nothing ever came of the discussions.

M & A had previously added Dr. Greg Rasp, another radiation oncologist, as an employee. Rasp was given a preliminary contract similar to the contract that Kademian originally had, and was supposed to be considered for partnership within a few years after his employment. When Rasp was considered for partnership, Marger wanted to retain his 51% share in M & A

and require Kademian to give or sell one-half of his shares to Rasp. Kademian refused to divest himself of his interest, and this issue was never resolved prior to the dissolution of M & A.

In January 1999, Rasp entered into a "restated" employment contract with M & A. This agreement provides that Rasp's employment would continue until terminated as provided in Section 10 of the agreement. * * *. Under the agreement, Rasp was to maintain staff privileges at Franciscan Medical Center-Dayton Campus (formerly known as St. Elizabeth's) and such other hospitals at which he practiced. * * * The agreement also contains a restrictive covenant, which provides as follows:

11. Restrictive Covenant. Employee acknowledges (a) that the Employer has a large investment of time, effort and money in obtaining its relationship with the hospitals at which the Employer's employees practice medicine ("Hospitals"), with each such relationship hereafter referred to as a "Relationship," (b) that the Employer's success depends upon its developing and maintaining such Relationships, (c) that each Relationship constitutes an asset and property of the Employer, (d) that the recruitment and orientation of employees to staff the Employer's needs represents a substantial investment by Employer, and (e) that Employee's performing services for the Employer constitutes a position of

trust by the Employee which may result in a relationship whereby Employee could influence future actions of a Hospital or others relative to a Relationship.

Therefore, if a Relationship is terminated because the Employee solicited or agreed to perform (directly or indirectly) in the future similar services as were provided by the Employer's employees at a Hospital, then the Employer would be damaged and such interference, solicitation and/or agreement by the Employee would constitute a breach of trust and a breach of [sic] and the Employee's fiduciary duty to the Employer.

Accordingly, the Employee shall not breach the Employee's fiduciary duty to and position of trust with the Employer, and the Employee shall not, individually or in concert with any other person or entity, do anything to adversely influence or interfere with a Relationship. In addition, the Employee agrees that for a period of 12 months after the Employee's termination of employment with the Employer without cause, or the Employer's termination of the Employee's employment for cause, the Employee shall not, directly or indirectly, at a Hospital, whether alone, or as a shareholder, partner or member, or as an officer, director,

manager, employee, contractor or otherwise, perform services similar to those provided by the Employee during the Term.

Provided, however, if the Employer loses, breaches, surrenders or terminates its contract at Franciscan Medical Center-Dayton Campus or in any way curtails, limits or decreases the services it provides at Franciscan Medical Center-Dayton Campus, then the provisions of this Section shall be null and void and the Employee shall not be subject to the restrictive covenant provisions set forth in this Section.

\* \* \*

During 1999, merger discussions with Field's group continued, despite the fact that Kademian wanted to end the discussions. In December 1999, Marger ended the discussions due to Field's failure to disclose financial information. At the time, no one knew that Field's group had been sold to U.S. Oncology, a for-profit cancer treatment national corporation.

During the early part of 2000, M & A was beginning to have more of a physical presence at Miami Valley, and its doctors had been given limited privileges to treat patients, despite the fact that Field's group had an exclusive contract. M & A's ability to practice was due to the issues with Field and the fact that Field had sold another party a free-standing radiation center that Miami Valley wanted to buy.

In January 2000, a patient described at trial as Patient X was referred to

Kademian for a decision on whether he should have radiation treatment for a possible reoccurrence of cancer in his prostate gland. Patient X had been previously treated at Miami Valley by Field.

While taking Patient X's history, Kademian learned that Patient X had suffered severe radiation burns on his legs in 1999, after being treated by Field for skin cancer on his legs. Patient X was apprehensive about having more radiation treatments because he thought he might be overly sensitive to radiation. After obtaining the records for Patient X, Kademian discovered that the patient had been exposed to excessive amounts of radiation, and had been exposed in areas where radiation should not have been given. In addition to the severe burns that were caused, the treatment created a risk of future problems, like radiation necrosis or tissue death, which did, in fact, later occur with Patient X.

In early February 2000, Kademian wrote a letter to Miami Valley's radiation safety officer, reporting the over-exposure and alleged substandard treatment, which Kademian contended should have been reported to the Ohio Department of Health. Kademian asked the hospital to address the issue, so he would know what to tell Patient X when they discussed radiation treatment for his prostate cancer. Kademian copied the letter to the chairman of the radiation safety committee, and to Gary Marshall, who was Premier Health's vice-president of Oncology Services for both Good Samaritan and Miami Valley.

Kademian did not receive a response to this letter, so he sent another letter in early March to Marshall, indicating that he would have no choice but to report the over-radiation if the hospital did not report it. Kademian also requested a meeting with Marshall and Premier Health's general counsel, Dale Creech. In addition, Kademian copied Miami Valley's COO with the letter. Marshall replied, stating that nothing had occurred that needed to be reported, and that he would arrange a date for a meeting. Marshall also stated that it would be "unfortunate" if Kademian implicated the hospital in discussions he had with anyone, particularly since Miami Valley had not completed its investigation.

* * *

Kademian and his attorney subsequently met with Premier Health's general counsel, Creech, to discuss concerns about the radiation oncology department and the necessity of reporting the mis-administration overdose. During the meeting, Creech revealed Miami Valley's concerns about Field and his clinical qualifications. Creech also expressed the opinion that the overdose was not reportable, but told Kademian to go ahead and report it if he felt he should. After the meeting, Kademian then met with Rasp, Marger, M & A's attorney, and his own attorney. Rasp and Marger did not say not to report the incident. Marger asked Kademian not to report it to the Department of Health without telling him first, and Kademian agreed. Kademian later decided to go ahead and report the matter, however, because he was concerned and his concerns were increased by Creech's comments. * * *

During the week of April 10, 2000, Kademian and his attorney met with representatives of the Ohio Department of Health, Bureau of Radiation Protection, which administers the radiation safety programs for the Department of Health. Kademian reported the alleged radiation overexposure of a Miami Valley patient. As a result of the meeting, an inspector arrived at Miami Valley on April 18, 2000, for an inspection. This was the first day Miami Valley would have become aware of the inspection. The inspector stayed for two days. Prior to the arrival of the inspectors, Miami Valley had not referred the Patient X matter to an independent consultant for review. In addition, Kademian had never received any substantive response from Marshall.

An "absolute coincidence" occurred the first day of the inspection, according to Marger. On April 18, 2000, Marger told Rasp and Kademian that he (Marger) was leaving M & A. At trial, Marger testified that when he talked about leaving M & A, he had no idea that the state had come to investigate Miami Valley. Conversely, Kademian testified that Marger is the one who told him that the Department of Health inspection had started on April 18, 2000. Marger and Kademian discussed whether or not Kademian should have gone to the Department of Health, and Marger said, "I can't control you. You are affecting my health, Mike, you are affecting my blood pressure, you're affecting me emotionally * * * and you're going to be affecting me financially." * * * During this discussion, Marger also told Rasp that he would

"take care" of him.

Miami Valley hired an independent consultant to peer-review the incident, but did not do so until after the Department of Health began its investigation. On May 16, 2000, two more inspectors from the Bureau of Radiation Protection came to Miami Valley to continue the inspection. Shortly thereafter, on May 23, 2000, Marshall, the vice-president of Oncology for both Miami Valley and Good Samaritan, and Bobbie Martin, the director of Oncology at Good Samaritan, discussed information that could only have come from Marger or Rasp.[]

Martin's notes about the conversation state "confidential Marger, MK will get notice this Thursday that corporation will be dissolved by next Friday. * * *"_ * * * Martin's notes further indicate that KDD (referring to Doug Deck, the chief executive officer of Good Samaritan) would sign with the "new corporation," and that "MK" would have a period of time so continuity would not be disrupted. * * * Other notes written by Martin indicate that "Marger needs to let Greg out of exclusive. Dissolve contract. * * * Give Greg exclusive contract," and "Appoint Greg as acting medical director. Have Marger let him out of the exclusive clause. Dissolve corporation. Award Greg exclusive contract." * * *.

On the same day these notes were made, notices were sent out indicating that a shareholder meeting to dissolve M & A would be held on June 2, 2000. On June 2, 2000, Marger voted to liquidate M & A, over

Kademian's objection. The liquidation was effective June 30, 2000, with M & A ceasing active operations on that date. Before the dissolution, the corporate earnings of M & A were approximately $2,000,000 per year.

Prior to the meeting on June 2, 2000, M & A's corporate attorney prepared Articles of Incorporation for Cancer Consultants of Southwest, Ohio, Inc., at Marger's request. Marger signed the articles of incorporation and the appointment of himself as statutory agent for Cancer Consultants on the same day that he voted to dissolve M & A. The articles of incorporation for Cancer Consultants were filed with the Ohio Secretary of State, and bear a date-stamp of June 5, 2000.

Marger admitted having had discussions with Rasp about continuing a professional association together. When Marger had these discussions, he knew that Rasp was under a contractual agreement with M & A and would have to be released from that agreement. Marger acknowledged that he had also an employment agreement with M & A that contained a covenant not to compete, and that he knew, based on his discussions with M & A's corporate attorney, that when a corporation is dissolved, all contracts referable to the corporation are null and void. Marger further admitted that dissolving M & A allowed him to form Cancer Consultants, and that he and Rasp had a plan to continue practicing full-time, as 50/50 owners of Cancer Consultants, at the same institutions where M & A and its doctors had practiced. At the time, Kademian was primarily practicing at Good Samaritan; the group as a whole

practiced at Franciscan and Good Samaritan, with some limited practice at Miami Valley. Rasp knew that Marger was forming an entity so that the two of them could practice radiation oncology.

On June 7, 2000, M & A's corporate attorney sent Marger copies of employment agreements for both Marger and Rasp with Cancer Consultants, and two copies of a shareholder's agreement for Cancer Consultants. On the same date, coincidentally or not, Medical Billing Services for the New Century (MBI), the billing service for M & A, sent Kademian a letter, refusing to provide billing services to him. The letter indicated that MBI had made the decision because of "the potential conflict of providing billing services for competitors within the same location." * * *  MBI then went on to provide billing services for Cancer Consultants.

* * *

In late June 2000, Kademian went on vacation. When he returned, he received a letter from Rasp dated July 4, 2000, written on Cancer Consultants letterhead. The letter lists the areas of practice as Good Samaritan, Miami Valley, and Franciscan. In the letter, Rasp states that: "Don told me on Friday (6/30/00) that he filed the documents to dissolve Donald Marger, M.D. and Associates, Inc. Given that, I have formed the above named corporation." * * *.

Kademian spoke to Rasp that afternoon, and was told that he should form his own corporation. Rasp did not, during this conversation, or any other,

ask Kademian to join Cancer Consultants, nor did he suggest that Kademian might be able to join Cancer Consultants. Rasp also never disclosed to Kademian what had occurred regarding Marger and the formation of Cancer Consultants. Kademian also discovered that day that all the patients Marger had been treating, as well as those who were coming up for checkups months or years after their prior treatment, had been transferred to Rasp. Additionally, he discovered that Rasp had already had prescription pads printed for Cancer Consultants.

Furthermore, Kademian called Upper Valley Radiation Center, located north of Dayton, and learned that Marger was working there full-time, despite having announced his retirement. At the time of trial, Marger was still working for the same employer, but worked part-time.

In late July 2000, the Department of Health sent Gary Marshall, Premier Health Vice President of Oncology Services, a notice of violations letter and a report of its investigation of the Patient X situation, based on the findings of three investigators who had worked on the report. The notice detailed six violations, including lack of documentation to establish that Miami Valley was following proper procedures for addressing complaints; deficiencies in Miami Valley's timely submission of data to the Department of Health, problems with Miami Valley's quality assessment and improvement program; and a lack of documentation that the radiation oncologist set limits of doses to critical structures surrounding the treatment area. The report also

concluded that the inadequate quality assessment and improvement program and inadequate complaint handling process all contributed to a radiotherapy course that resulted in a "disproportionated output of the prescribed radiation dose across the treatment field." * * * The Department of Health ordered Miami Valley to submit various evidence and to develop a corrective action plan to address the violations within thirty days of receipt of the letter.

Miami Valley's response was sent to the Department of Health on August 24, 2000. One of the attachments was a final report from Miami Valley's independent consultant, dated June 16, 2000. Consistent with Kademian's findings, the report concluded that the quality of care provided to Patient X fell below accepted standards of care.

In June or July 2000, Kademian learned that Miami Valley was considering hiring Dr. Ditzel for the position of radiation oncology director. After meeting Ditzel, Kademian then met with Mary Boosalis, the vice-president and COO for Miami Valley, during the week of August 7, 2000. At the meeting, Kademian and Boosalis discussed the selection process for the director's postiion [sic], Ditzel's qualifications, the quality of care in the radiation oncology department, and the Patient X matter. Kademian expressed concern over the selection process, because the job had not been advertised, and it was his understanding that the decision had already been made, with only one candidate, Ditzel, having been considered. On August 13, 2000, Kademian wrote a follow-up letter to Boosalis, opposing Ditzel's selection for

two reasons. The first reason was that the selection process was flawed, and the second was that Kademian did not believe Ditzel was the most qualified candidate that could be found.

Boosalis replied on August 17, 2000, stating that the decision of who to hire as medical director belonged to Miami Valley. Boosalis also told Kademian that he could only treat patients at Miami Valley until a new exclusive contract was signed with Dr. Ditzel's group. According to Miami Valley representatives, Miami Valley had discussed with Rasp the fact that Ditzel and a colleague, Dr. Paessun, were going to come to Dayton and practice with Rasp. The question was whether Kademian should continue to practice, and the consensus was that they would have a new group with Ditzel, Rasp, Paessun, and Kademian. However, after Kademian made his displeasure about Ditzel known, it was the collective decision of Boosalis, Bill Thornton, Miami Valley CEO, and Marshall, the vice-president of Oncology for both Good Samaritan and Miami Valley, that Kademian would not be able to practice.

Kademian contended, however, that no one ever told him that they wanted him to stay at Miami Valley. In fact, Kademian tried to meet with administrators and they would not meet with him. He also tried to talk with Doug Deck, the president at Good Samaritan about staying at Good Samaritan; Deck refused to meet with him. In addition, Kademian testified that Rasp never came to him and said anything about working to try to include

him in Cancer Consultants, nor did Rasp ever say anything to him after June 30, 2000, about working together. Rasp also never told Kademian that he was being scrutinized by the hospitals in any way in terms of coming into Cancer Consultants.

In the fall of 2000, Good Samaritan and Miami Valley signed exclusive contracts with Cancer Consultants, which meant that Kademian would not be able to treat patients at either hospital, because he was not employed by Cancer Consultants. In addition, Franciscan was not an option, because it had closed by that time.

At trial, Kademian presented evidence indicating that he had lost the following amounts due to the alleged breach of fiduciary duty and civil conspiracy: (1) equity and goodwill in the amount of $203,651, based on the dissolution of M & A; (2) lost earnings, plus interest, of approximately $6,386,861 through March 31, 2010, and lost retirement contributions, plus interest[] from 2001 through 2011, of about $350,529. The lost wages were calculated based on Kademian's 1999 earnings of approximately $456,000.

In late September 2000, Kademian filed suit against Marger, M & A, Rasp, Cancer Consultants, Good Samaritan, Miami Valley, and Premier Health. The complaint was dismissed without prejudice and was refiled in April 2002, against the same parties. The complaint included claims of breach of fiduciary duty, breach of contract, and conversion against Marger; claims of breach of duty of loyalty and good faith, and breach of contract against Rasp;

and claims of tortious interference with contract, tortious interference with business expectancy, violation of R.C. 4113.52, and civil conspiracy against all defendants. After motions to dismiss certain claims were sustained, Kademian filed an amended complaint in August 2003, adding claims of breach of a buy-sell agreement and breach of duty of good faith and fair dealing against Marger; claims of conversion against Rasp; claims of replevin against Marger, Rasp, and Cancer Consultants; and claims of constructive trust against Rasp and Cancer Consultants.

In 2006, the hospital defendants were dismissed, with prejudice. Ultimately, the remaining claims were dismissed, other than the breach of fiduciary duty and conspiracy claims[1], which proceeded to trial, with Marger and Rasp as the remaining defendants. Kademian settled his claims against Rasp during trial, leaving Marger as the sole defendant.

At the end of Kademian's case, Marger moved for a directed verdict, which was granted by the trial court on the theory that Marger did not take advantage of the alleged breach of fiduciary duty and conspiracy, because he did not practice further with Good Samaritan and Miami Valley. * * *. *Id*., ¶ 5-51.

{¶ 3} This Court noted as follows:

Marger argues that he had the right to dissolve the corporation. This

---

[1] The claims before the trial court were breach of fiduciary duty, conversion, and tortious interference.

is true. However, we have stressed that even if a particular close corporation or partnership decision cannot be contested, "the manner in which the decision is made cannot violate the majority's fiduciary duty." *Schhafer v. RMS Realty,* 138 Ohio App.3d 244, 274, 741 N.E.2d 155 (2d Dist. 2000). In *Schafer*, a majority of partners issued a capital call, which was within their right to do under the partnership agreement. However, their action was taken in an attempt to squeeze out a minority partner. On appeal, we affirmed a jury verdict rendered in favor of the minority partner, noting that while the minority partner "could not contest the capital call itself, he could bring an action for breach of fiduciary duty if the defendants acted in bad faith or in a duplicitous manner by voting for and proceeding with the capital call." Id.

*Kademian I*, ¶ 69.

{¶ 4} Upon remand, Kademian testified that M & A began to have problems in late 1997 or early 1998 which "were principally related to the fact that Good Samaritan Hospital had been taken over by Miami Valley and I would characterize a corporate takeover with the formation of Premier Health Partners." Trial Transcript ("T.T."), pg. 16. Kademian testified that he was "livid" to learn that Marger formed an LLC with Dr. Field's group in 1998, because "Dr. Marger and I had had numerous conversations from the day that I moved to Dayton about Dr. Field[], numerous. We had those conversations and they always centered about Dr. Fields (sic) substandardness as a physician." T.T. pg. 17.

{¶ 5} Regarding Patient X and the formation of Cancer Consultants, the following exchange occurred:

Q. Tell the jury briefly what happened at the meeting with the Department of Health.

A. Briefly we met, Steve[2] and I met with Roger Suppes, who is chief of the radiation protection division, Maggie Wanchick, who is an investigator, I think. And there were two or three other people. And I just presented my concerns about this particular case and my particular concerns in general about safety matters at Miami Valley Hospital.

Q. And that was on either the 12th or 13th of April, 2000?

A. Yeah, thereabouts. * * *

Q. What happened after that?

A. The next thing was the following week because there was a weekend between there. So in the following week I didn't hear anything until I had a meeting with Drs. Marger and Rasp at St. Elizabeth's Hospital. * * *

Q. What happened at that meeting?

A. Well, the meeting, we're sitting there and Dr. Marger said, "Mike, the Department of Health is investigating Miami Valley Hospital." And he was very upset about it.

Q. What happened?

* * *

A. * * * [The Department of Health] had been at the hospital that day

---

[2] Steve Dankof, counsel for Kademian at the time.

that we were having our meeting and he was upset about it because I had gone to the state to report it. And then he made an announcement, he and Dr. Rasp.

Q. What was the announcement?

A. Well, he said, "You know, I've had it with you. I can't control you. You're affecting me emotionally. You're affecting me physically. My blood pressure is going up. And you're going to be affecting me financially. You're getting the hospital in trouble. And because of what you've done, I am leaving [M & A]." And he kind of laughed. He said, "I'm leaving you [M & A]. You're going to be [M & A]. Ha ha." Because the irony that he was going to be gone and I would have this corporation called [M & A].

And then he also said to Dr. Rasp, "Don't worry, Greg. I will take care of you." Then he opened it for discussion. Greg and I were sitting next to each other. He was across from us. And, you know, I explained why I went to the state. I just said, "I went to the state because I went to the state because I thought it needed to be done." And he several times asked if anybody had anything to say. I gave my explanations as to why I did what I did and he again two or three times asked, "Does anybody have anything to say?"

So finally I just said, "I don't have anything to say," and I left. I left Greg and Don and I left. I went home.

Q. What happened next?

A. In terms of?

Q. Well, you said that Dr. Marger indicated to you that he was going to leave you from Marger and Associates. (Sic).

A. He said he was going to leave me the corporation.

Q. Did he do that?

* * *

A. No. Oh, what happened next is that was the middle of April, so it's kind of limbo land because I didn't know what he was talking about. I didn't know what leaving me the corporation really meant. And Steve Dankof was my attorney at the time and he would sometimes hear things from the corporate attorney, Rick Carli[]le. I don't think Don Marger and I had a conversation about anything other than direct patient care after that meeting.          * * *

And then probably sometime in May, and I don't know the date, I received a call from my attorney, Steve, who told me that Marger was going to dissolve Marger and Associates. He had heard this from Rick Carli[]le that the corporation was going to be dissolved. I didn't really know what that meant. And so then subsequently I received I think through Steve a letter saying we're going to have a shareholders meeting for the purpose of dissolving Marger & Associates.

Q. Did you have a meeting?

A. Yep.

Q. What happened at the meeting?

A. Well, the meeting was in early June. * * * . Steve and I went. Carli[]le was there with Dr. Marger. And Dr. Marger made a motion that we dissolve Marger & Associates. It was open for discussion. Steve spoke on my behalf. Said, "You know, we don't want the corporation dissolved. We see no reason to dissolve the corporation." After the discussion we took a vote and I voted 49 percent to not dissolve the corporation. End of meeting.

Q. Why did you vote to not dissolve the corporation?

* * *

A. Because it was our business entity. It was the place that I - - the entity through which I earned my livelihood, so there would be no reason for me to want to dissolve it, to make it go away. T.T. pg. 69-72.

{¶ 6} Kademian identified Exhibit 200, the July 4, 2000 letter from Rasp to Kademian, as described in the facts above, and the following exchange occurred:

Q. At any time did anyone ever inform you that it was not Dr. Rasp that had formed Cancer Consultants - -

* * *

Q. - - and that it was Dr. Marger?

* * *

A. Never.

Q. Did anyone ever inform you that Dr. Marger had a plan to

practice with Dr. Rasp and exclude you from that practice?

A. No, I only learned of that from discovery.

Q. Did anyone ever suggest to you that you would be able to join Cancer Consultants?

A. Never. T.T. pg. 77-78.

Kademian testified that when he returned from vacation, "all of the patients that Dr. Marger had been treating - - we were all treating patients at Good Sam. All of his patients had been transferred to Dr. Rasp." Pg. 79.

{¶ 7} The following exchange occurred on cross-examination:

Q. Are you aware of any fact whereby Dr. Marger received any compensation, or anything of value from either the hospital, Premier, Miami Valley, or Good Sam by reason of his decision to dissolve [M & A]?

A. No.

Q. Did Dr. Marger after June 30th, 2000, ever see (sic) or work at Miami Valley Hospital?

A. To my knowledge, no.

Q. Good Samaritan Hospital?

A. To my knowledge, no.

Q. Franciscan Hospital?

A. To my knowledge, no.

Q. Was Dr. Marger after June 30th, 2000, every (sic) employed by or provide any services to any premiere hospital that you know of?

A. No. T.T. pg. 94.

* * *

Q. * * * During the period of June 2000, did you have discussions with Dr. Rasp about working together?

A. We probably had some discussions during June. Yeah.

Q. * * * did Dr. Rasp say anything to you about working together?

A. We talked about the future, and we talked about the possibility that that might happen. * * *

Q. Did you ever tell Dr. Rasp after the meeting in June, "You're free white and 21."?

A. Yes, I used that term.

Q. What'd you mean by that?

A. I meant he was free. I meant he was white, not in a disparaging way, and that he was 21. That he was an adult and that free will (sic). He had free will.

* * *

A. * * * I was completely in the dark about Cancer Consultants, so I was operating in a vacuum. So anything that I was saying at that time was based on not knowing what was happening. T.T. pg. 100-01.

{¶ 8}    Kademian admitted that he had "ill will" toward Marger "because he, you know, announced at the meeting on April 18th, because I went to the State of Ohio he was going to do something." T.T. pg. 103. Kademian testified that in 1999, he and Marger

"had a very collegial relationship." T.T. pg. 103. Kademian denied having ill will toward Marger since 1998. Kademian further acknowledged that, since M & A did not have any contracts with the hospitals where it provided services, that it was important for M & A to maintain a good rapport with the hospitals, the technicians, the therapists and the nurses there. Kademian stated that M & A was "not dissolved for any legitimate business reason." T.T. pg. 124. Regarding the Western Ohio stock, Kademian stated that the issue arose in 1998, and that it was about the "fact that our corporation owned Western Ohio stock and it was sold and Dr. Marger received all the proceeds." T.T. pg. 126. Kademian denied that the issue persisted into 2000, and he stated that he and Marger "agreed to disagree" in 1998 about the stock. T.T. pg. 127.

{¶ 9} Kademian identified, as Exhibit 114, correspondence dated June 12, 2000 from him to Marger which was copied to the CEOs of Good Samaritan and Premier. When asked if the letter suggested that Marger committed malpractice, Kademian responded, "I say that his treatment was sub-optimal and incorrect. * * * I consider it a representation of fact. It's not intended to disparage. It's intended to describe fact; sub-optimal and incorrect." T.T. pg. 151. Kademian also identified, as Exhibit 116, correspondence dated June 13, 2000 from him to Marger, which was also copied to the CEOs of Good Samaritan and Premier. The following exchange occurred:

Q. Did you send this letter to disparage Mr. Marger's treatment of this patient?

A. No. The intent of the letter was to inform the CEOs that peer review was being abandoned at our hospital, per the order of Dr. Marger.

Q. And so your effort to talk about peer review was to send CEOs letters about your opinions on Dr. Marger's care of patients?

A. No. No. No. No. * * * My concern was that Dr. Marger abandoned peer review. T.T. pg. 153.

Kademian acknowledged that he sent both letters "while I was an employee and co-owner of [M & A]." T.T. pg. 154.

{¶ 10} Bobbie Martin, the director for Oncology at Good Samaritan, testified regarding her notes as set forth in the facts in *Kademian I*, above, and she acknowledged that they indicate that Marger would have to let Rasp out of his exclusive contract. On cross-examination, she indicated that she received "multiple" complaints regarding Kademian from her staff from 1998 to 2000. When asked what the complaints were about, she responded, "Behavior. Yelling at staff. The nurses would complain that they were not allowed to ask him a question directly. They needed to write it on a piece of paper and put it in his office, as long as he was not in his office. So they had to kind of jockey to see when they could leave a note to get a question answered. That's an example." T.T. pg. 271.

{¶ 11} Marger testified that the issue regarding his sale of the Western Ohio stock, after Kademian became a partner, was a contentious issue throughout the parties' entire working relationship. He further testified that Kademian was "very, very against" associating with the Field group, and that "that issue plus the Western Ohio issue, those were just basically very big contentious issues pretty much until the end of the corporation." T.T. pg. 573. Regarding Kademian's interactions with hospital staff, Marger stated that he "saw

several instances where Dr. Kademian was indeed being quite aggressive with the staff and yeah, that couldn't help but somehow affect our relationship with the hospital administrations." T.T. pg. 574. Marger stated that peer review "is a process by which a physician's work is evaluated by his peers." T.T. pg. 589. He stated that M & A began practicing at Miami Valley in early 2000, and that he "kind of like[d] the way they do their peer review. It was different than the way we were doing it." T.T. pg. 589. Marger stated that he instituted Miami Valley's peer review process at Good Samaritan, and that Kademian "became so mad at me. He wouldn't talk to me at all and he refused to even be in the same room with me." T.T. pg. 590. Marger stated that through April, 2000 his relationship with Kademian "was continuing to deteriorate. * * * this Western Ohio business kept getting raised. And Dr. Kademian and I were coming (sic) more and more distanced over a variety of issues, like the peer review." T.T. pg. 590. When asked about his health in 2000, Marger stated, "Early 2000, it was okay. But after a few more months, you know, when we were getting like into the spring, I was having a lot of medical problems. I really was. I mean, this was affecting my health. Our relationship." T.T. pg. 591.

{¶ 12} When asked about Patient X, Marger stated that he and Drs. Rasp and Kademian had a meeting "where when we were talking about his reporting this, Dr. Rasp and I had requested of him that he at least let us know what he's going to do, because this obviously was affecting the administration or would have an effect on the hospital administration." T.T. pg. 592. Marger stated that he did not "want to be blindsided someday in the hall by an administrator saying, 'Oh, did you know Dr. Kademian did this, that and the other.'" T.T. pg. 592-93. Marger testified, "I think basically, when I heard

that Dr. Kademian had reported it or was going to report it to the State, just a few days after we had asked Dr. Kademian to at least tell us what he was going to do, and he went ahead and did it anyway without letting us know, that was the straw that broke the camel's back." T.T. pg. 594. At that time, Marger stated, "My health is at risk and I just - - I need to divorce Dr. Kademian. I think we had a very, very bad marriage." T.T. pg. 594.

{¶ 13} Marger stated that he and Rasp and Kademian had a meeting in April, 2000, and Marger stated, "I don't remember my exact words. I think I said I'm leaving Marger and Associates. * * * I said I'm leaving." T.T. pg. 594. Marger stated that he called the subsequent shareholders meeting because he thought that was "the cleanest way to disassociate myself from Dr. Kademian." T.T. pg. 595. The following exchange occurred regarding the June 30, 2000 dissolution of M & A:

Q. Now, in June, what was your idea about what you were going to do on July 1? And this is early June?

A. Emotionally and physically, I was in a good bit of turmoil right about that period of time. But after I had announced that I was * * * leaving [M & A], or whatever it was that I actually said - - I mean, that was the effect of it though. I started to think about what I wanted to do. And I wasn't absolutely sure what I wanted to do, but I knew I still wanted to possibly be able to practice, if that's what I chose to do.

Q. Okay. So did you have any discussions then with Dr. Rasp about maybe practicing with you on July 1 or August or September?

A. Eventually I did. Not when I made that decision.

\* \* \*

Q. What did you do next in terms of what your future was going to hold?

A. Well, if I wanted the potential to continue to practice, I was going to have to set up some sort of practice vehicle, you know. And that's actually the - - that was actually the genesis of Cancer Consultants of Southwest Ohio.

Q. So what was the purpose of Cancer Consultants of Southwest Ohio?

A. Well initially, it was, as I said, a - - how was I going to continue to practice, if that's what I decided to do?

Q. Did you ever fund to Cancer Consultants? Put any money it? (Sic)

A. Only money was whatever fees were required by the State to file the paperwork.

Q. Did you ever receive any income from Cancer Consultants?

A. No.

Q. Did you ever work for Cancer Consultants?

A. No.

Q. Did you talk to Dr. Rasp about potentially becoming a partner of yours after Marger and Associates ceased doing business?

A. Yes, I did. I - - I had Cancer Consultants. And at some point, I

asked Dr. Rasp if he would have any interest in working with me.

Q. * * * were there preliminary contracts drawn up, if you remember?

A. Yeah. He - - you know, he said, you know basically, yes, he would consider it. So asked Mr. Carli[]le to go ahead and draw up some basic contracts for our review.

Q. To your knowledge, was anything ever signed?

A. No. Nothing was signed, to my knowledge.

* * *

Q. * * * Now, after you talked to Dr. Rasp - - by the way, did you have any discussions with Dr. Kademian in this - - in the period of time of June about what you were going to do after June 30th or what he was going to do after June 30th?

A. No.

Q. Why not?

A. Well, among other reasons, Dr. Kademian was not talking to me at the time. But you know, I - - with the dissolution of the corporation, you know - - and everybody can do whatever they wanted. So I figured we're all big boys and we can go off and practice however we think is appropriate.

Q. But was it your understanding or belief that Dr. Kademian would continue to practice at the same hospitals after - -

* * *

Q. June 30th?

A.    - - I absolutely was convinced that Dr. Kademian was going to continue to practice.   I just had no doubts about that.

Q.   But not with you.

A.   Correct.   I had, you know, no problem with him continuing to practice.   Just we couldn't be partners anymore.

Q.   To your knowledge, after June 30th, were all the accounts receivable and other assets of [M & A] distributed pursuant to the contracts, to your knowledge?

A.   Absolutely.

Q.   Was Dr. Rasp involved in the incorporation of Cancer Consultants?

A.   No.

Q.   What happened in the first week - - or let's say the second week or the third week in June?   Did you change your mind in terms of continuing to practice in Dayton?

A.    Yeah, so right along about the middle of June - - well, you referred to this epiphany and that's actually the word I used. I realized that if I continued to practice in Dayton, you know, by myself, with whoever, anybody else, I would still have to be dealing with Dr. Kademian or interacting with him frequently.   We would be going to the same tumor board meetings.   We would be going to cancer committee meetings.   We would be going to radiation safety meetings.

I would probably be seeing him still several times a week. And I said my health just isn't worth this. And I said, you know, the heck with it. I do not need to practice anymore full time in Dayton, Ohio. And that was the end of it.

Q. Did you ever use the term, "I'm going to retire?"

A. I might have. I might have.

Q. Did you mean from the practice of medicine?

A. No, I never really planned on retiring from the practice of medicine. I certainly planned on retiring from [M & A].

Q. Did you ever have any discussions in May or June of 2000 with the hospitals about entering in exclusive contracts just with you?

A. Absolutely not. I never had any contact with anyone in any hospital regarding exclusive contracts.

Q. Now, we're back to this epiphany. Do you remember when in June that was?

A. I think it was right almost exactly around the middle of June.

Q. So what happened next in terms of Cancer Consultants?

A. I think it was Dr. Rasp's attorney who contacted Mr. Carli[]le and basically asked him, "What am I going to do with Cancer Consultants?" You know, and I had nothing to do with it. I wasn't going to use it. I wasn't going to practice.

And I think it was his attorney who suggested to Mr. Carli[]le, if Dr. Rasp would pay the fees associated with its incorporation, could he just go ahead and use it? Because I, you know, I had basically laid the business groundwork, like an - - you know, like a tax ID number, things like that.

Q. And did you have any further affiliation starting on July 1 with Cancer Consultants in any way?

A. You know, since June 30th of 2000, I have never even set foot in Good Samaritan or Miami Valley again, literally. No. The answer is no. T.T. pg. 598-603.

{¶ 14} Marger also testified that in the middle of June, 2000, Kademian expressed an interest in buying the shares of M & A, and that he told Carlile to "pursue it." According to Marger, "we just never heard back from Dr. Kademian. Nothing was ever signed. But I - - you know, again, with certain considerations, I was willing to sell him the shares of stock." T.T. pg. 605. The following exchange occurred on cross-examination:

Q. Your decision to dissolve [M & A] came at a time when you had a plan to continue in the practice with its employee, Dr. Rasp and without Dr. Kademian.

A. That's absolutely not true. My decision to dissolve it came before I knew what I was going to do, before I had any thought of continuing or not continuing. The decision was based solely on my need to divorce myself from Dr. Kademian.

Q. When was Cancer Consultants formed?

* * *

A.  I think the official paperwork was June 2nd of 2000.

Q.  Same day that you voted to dissolve [M & A], correct?

A.  Yes.

Q.  You used [M&A] attorneys to create this competing corporation, correct?

A.  They were never - - there was no competition.  They were never in competition.  They never existed in terms of providing services.  There was no way for them to compete.

Q.  Do you recall watching your video when you said that Cancer Consultants was going to do exactly the same thing that [M & A] had done in exactly the same places?

A.  Provided radiation oncology services. (Sic)

Q.  At the same hospitals.

A.  That's what I intended, yes.

Q.  The only thing that would be missing would be Dr. Kademian, correct?

A.  No. I absolutely expected Dr. Kademian to be there also.

Q.  The only thing that would be different as between Cancer Consultants and [M & A] * * * was that Cancer Consultants would not involve Dr. Kademian, correct?

A.  Correct.  Cancer Consultants would not involve Dr.

Kademian.

Q. Dr. Rasp knew that you were going to form Cancer Consultants, correct?

A. Yes.

Q. And he learned that from you: is that correct?

A. That's correct.

Q. And you didn't involve Dr. Kademian in those discussions, did you?

* * *

A. - - no, no, no.

* * *

Q. You said at some point in time, there was discussions after you voted to dissolve [M & A] about you selling the entity to Dr. Kademian, correct?

A. That's correct.

Q. Do you recall one of the terms of that sale being that Dr. Rasp could be released from any sort of covenant?

A. That's correct.

Q. * * * And you weren't going to be with the company, correct?

A. Correct.

Q. And he had to change the name of the company; is that correct?

A. Yes, after a certain length of time, because in all honesty, I did

not know what Dr. Kademian was up to and I honestly did not want my name associated with him - - with his activities anymore.   T.T. pg. 616-19.

{¶ 15}   On redirect examination, the following exchange occurred:

Q.   Dr. Marger, some mention was made of Rick Carli[]le.   Is Rick Carli[]le also your personal counsel?

A.   Yes.

Q.   Was the formation for Cancer Consultants, did it have anything to do with [M & A] in terms of Mr. [Carli[]le being the counsel for [M & A]? Well, let me rephrase the question. * * * Was Mr. Carli[]le's work for you relative to Cancer Consultants personally for you?

A.   Personally for me?

Q.   Right.   As your counsel.

A.   Yes.   T.T. pg. 650.

{¶ 16}   Rasp testified as follows regarding the dissolution of M & A:

Q.   Now did there come to be a time in early 2000 when Dr. Marger informed you of his future or what he was going to do?

A.   In April   we had one of our regular meetings, the three of us that we would have - - I think they were on Tuesdays. * * * But and at this meeting he suddenly announced that he was leaving.   That things were ending.   And he wasn't very clear on what was going on.   I think Mike and I were - - well I don't want to speak for Mike, but I was stunned.

* * *

Q. Now in that earlier meeting, the one you mentioned in April, do you recall Dr. Marger ever telling you or did you ever hear that he would take care of you?

A. Oh, no.

Q. Did you ever hear Dr. Marger say I'm leaving the company to Dr. Kademian?

A. No.

* * *

Q. But it did come to your attention that [M & A] was ending business as of June 30th?

A. Yes.

Q. How did you receive that information?

A. I believe Mike, Dr. Kademian called me at home and gave me that information.

Q. What do you recall - - first of all, do you remember when that phone conversation took place?

A. It was in June of 2000. So it would have been very early in June 2000. Maybe June 2nd, 3rd, 4th, somewhere right in that time period.

Q. What do you recall of that conversation and what Dr. Kademian told you?

A. He told me that they had voted to I think he used the word dissolve the company. That it was going to end June 30th. You know, I

asked him what that meant and he said, you know, that he was going to form his own company. And I asked him what it meant for me and he said that, you know, you're free, white and 21. You can do what you want. T.T. pg. 507-509.

{¶ 17} At the conclusion of the evidence, counsel for Kademian moved for a directed verdict "on three aspects of its claim for fiduciary duty." He asserted that "Dr. Marger's conversations with Dr. Rasp, while a majority shareholder in Marger and Associates, was a breach of fiduciary duty," that the "use of Marger and Associates attorneys to form Cancer Consultants was a breach of Dr. Marger's fiduciary duties," and that "the plan that Dr. Marger admitted to was a breach of Dr. Marger's fiduciary duties. These are all undisputed facts. And reasonable minds can only conclude that this would be a breach of fiduciary duty."

{¶ 18} In its August 20, 2013 decision overruling Kademian's motion for judgment notwithstanding the verdict and a new trial, the trial court determined in part as follows:

The court has thoroughly reviewed the entire video transcript of the trial herein, and has considered the arguments of counsel contained within their Memoranda. Contrary to Plaintiff's assertions, the evidence at trial was not undisputed. While there was evidence before the jury that Marger's conduct could have constituted a breach of his fiduciary duties to Kademian, the evidence did not require a conclusion that Marger had breached those duties, nor does the inquiry stop there. The jury was permitted to consider

Marger's motives in dissolving the corporation, as well as whether he had acted in good faith and for a legitimate business purpose. Additionally, the jury was permitted to consider whether a schism existed between the shareholders such that it was no longer practicable to carry on the business of the corporation. There was ample evidence produced at trial that Dr. Marger and Dr. Kademian did not enjoy a productive or positive relationship and that Dr. Kademian's behavior toward Dr. Marger, hospital staff and patients was such that, if believed by or given weight by the jury, provided ample evidence in support of Dr. Marger's conduct and could lead to the conclusion that Dr. Marger's conduct in dissolving the business was the result of his good faith and was exercised for a legitimate business purpose. Still further, the evidence at trial was such that Dr. Kademian's behavior to those around him could be characterized as demeaning, dismissive, and unprofessional such that the jury could have concluded that such a serious schism had developed between the two physicians that it was no longer possible for them to carry on business together and that the schism resulted from Dr. Kademian's behavior, and not that of Dr. Marger.

When considering the Motion for Judgment notwithstanding the Verdict, and after construing the evidence adduced at trial and the facts established by any admissions in the pleadings most strongly in favor of the non-moving party, Defendant herein, and without engaging in any weighing of the evidence, the court finds that there is substantial, competent evidence

upon which reasonable minds may reach different conclusions. As stated above, while the evidence revealed that Dr. Marger no longer wanted to do business with Dr. Kademian and dissolved the corporation seemingly to do business with Dr. Rasp and without Dr. Kademian, there was ample evidence to support the conclusion that it was Dr. Kademian's behavior that caused the schism between the shareholders and, still further, that given Dr. Kademian's behavior, Dr. Marger's decision to dissolve the corporation was for a legitimate business purpose and was not lacking in good faith and, additionally, that no conversion of Plaintiff's property resulted. Therefore, Plaintiff's Motion for Judgment notwithstanding the Verdict must be overruled.

In considering Plaintiff's Motion for New Trial, and particularly any claim based upon manifest weight of the evidence, and, after weighing the evidence, the court finds that there was competent, substantial and credible evidence to support the verdicts of the jury and that the judgment is not contrary to law. For the reasons stated above relating the Plaintiff's Motion for Judgment Notwithstanding the Verdict, the court finds that Plaintiff's Motion for New Trial must also be overruled.

{¶ 19} Kademian asserts six assignments of error herein. We will consider his first three assigned errors together for ease of analysis. They are as follows:

"THE TRIAL COURT ERRED IN FAILING TO DIRECT A VERDICT IN FAVOR OF DR. KADEMIAN ON HIS BREACH OF FIDUCIARY DUTY CLAIMS."

And,

"THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY THAT DR. MARGER BREACHED HIS FIDUCIARY DUTIES TO DR. KADEMIAN."

And,

"THE TRIAL COURT ERRED IN FAILING TO GRANT DR. KADEMIAN'S MOTION FOR A JUDGMENT NOTWITHSTANDING THE VERDICT AND MOTION FOR A NEW TRIAL."

{¶ 20} Kademian asserts that the "evidence is undisputed that Dr. Marger and Dr. Rasp secretly entered into an agreement *prior to the dissolution of* [*M & A*] such that they would continue the practice in another entity without Dr. Kademian. * * * This was clearly a breach of the fiduciary duties owed by Dr. Marger to Dr. Kademian." Kademian asserts that the Court "made it abundantly clear in its Opinion that it is not the reason or the nature of the actions that are controlling, it is *'the manner in which the decision is made [that] cannot violate the majority's fiduciary duty.'*"

{¶ 21} In addition to the trial testimony above, Kademian directs our attention to the following exchange in Marger's November 17, 2006 deposition that was played for the jury at trial:

Q. When you suggested to Dr. Rasp that you might want to continue with him in a professional association, what was his response?

A. It was in the affirmative because I know that that was our plan.

Q. That was whose plan?

A. Our plan was to continue a professional association * * * as

Cancer Consultants.

Q. So for some period of time you and Dr. Greg Rasp planned to continue your professional association as Cancer Consultants?

A. Correct.

Q. But you don't know what that time frame was?

A. No.

{¶ 22} As this Court has noted:

* * * In *Ruta v. Breckenridge-Remy Co.* (1982), 69 Ohio St.2d 66, 23 O.O.3d 115, 430 N.E.2d 935, the Supreme Court of Ohio discussed the following analysis a trial court is to adhere to when ruling on a motion for directed verdict:

"When a motion for directed verdict is entered, what is being tested is a question of law; that is, the legal sufficiency of the evidence to take the case to jury. This does not involve weighing the evidence or trying the credibility of the witnesses; it is in the nature of a demurrer to the evidence and assumes the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, and gives to that party the benefit of all reasonable inferences from that evidence. The evidence is granted its most favorable interpretation and is considered as establishing every material fact it tends to prove. The 'reasonable minds' test * * * calls

upon the court only to determine whether there exists any evidence of substantial probative value in support of that party's claims. *See Hamden Lodge v. Ohio Fuel Gas Co.* (1934), 127 Ohio St. 469, 189 N.E. 246. Weighing evidence connotes finding facts from the evidence submitted; no such role is undertaken by the court in considering a motion for a directed verdict. A motion for directed verdict raises a question of law because it examines the materiality of the evidence, as opposed to the conclusions to be drawn from the evidence. To hold that in considering a motion for directed verdict a court may weigh the evidence, would be to hold that a judge may usurp the function of the jury. Section 5, Article I of the Ohio Constitution." Id. at 68-69, 23 O.O.3d 115, 430 N.E.2d 935.567

An appellate court reviews a trial court's ruling on a motion for directed verdict de novo, as it presents the court with a question of law. *Schafer v. R.M.S. Realty* (2000), 138 Ohio App.3d 244, 257, 741 N.E.2d 155. De novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial. *Dupler v. Mansfield Journal Co., Inc.* (1980), 64 Ohio St.2d

116, 119-120, 18 O.O.3d 354, 413 N.E.2d 1187. Thus, the trial court's decision is not granted any deference by the reviewing court. *Brown v. Scioto Cty. Bd. of Commissioners* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153.

*Lasley v. Nguyen*, 172 Ohio App.3d 741, 2007-Ohio-4086, 876 N.E.2d 1274, ¶ 16-18 (2d Dist.).

{¶ 23}   "The standard for granting a directed verdict set out in Civ.R. 50 also applies to a motion for JNOV. * * *."  *Randall v. Mihm*, 84 Ohio App.3d 402, 406, 616 N.E.2d 1171 (2d Dist.1992).  Finally, Civ.R. 59 governs motions for a new trial, and as the trial court indicated, while Kademian's "motion does not specifically delineate the grounds upon which he seeks a new trial, it appears he [relied] upon Civ.R. 59(A)(6) and (7), which provide for a new trial" because "(6) the judgment is not sustained by the weight of the evidence" and "(7) the judgment is contrary to law."  "A trial court's denial of a motion for a new trial is reviewed for an abuse of discretion. *Yungwirth v. McAvoy* (1972), 32 Ohio St.2d 285, 286, 61 O.O.2d 504, 291 N.E.2d 739."  *Zerkle v. Kendall*, 172 Ohio App.3d 468, 2007-Ohio-3432, 875 N.E.2d 652, ¶ 10 (2d Dist.)  "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *Huffman v. Hair Surgeons, Inc.*, 19 Ohio St.3d 83, 482 N.E.2d 1248 (1985). A decision is unreasonable if there is no sound reasoning process that would support that decision. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 553 N.E.2d 597 (1990); *Feldmiller v. Feldmiller,* 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, ¶ 7.

{¶ 24}   As this Court noted in *Kademian I*, "Claims for breach of fiduciary duty

require proof of the following elements: '(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom.' * * * ."   *Id.*, ¶ 57.

**{¶ 25}**   As this Court has previously noted:

A fiduciary duty is generally defined as " '[a] duty of utmost good faith, trust, confidence, and candor owed by a fiduciary * * * to the beneficiary * * *; a duty to act with the highest degree of honesty and loyalty toward another person and in the best interests of the other person.'"   *In re Trust of Bernard*, Summit App. No. 24025, 2008-Ohio-4338, 2008 WL 3918058, at ¶ 20, quoting from Black's Law Dictionary (8th Ed.Rev.2004) 545. * * *.

For example, "[p]artners in Ohio owe a fiduciary duty to one another." *Dunn v. Zimmerman* (1994), 69 Ohio St.3d 304, 306, 631 N.E.2d 1040. Controlling shareholders in close corporations also owe fiduciary duties to minority shareholders. In *Busch v. Premier Integrated Med. Assoc., Ltd.*, Montgomery App. No. 19364, 2003-Ohio-4709, 2003 WL 22060392, we noted:

"[L]ike partners, controlling shareholders of a close corporation owe a fiduciary duty to minority shareholders, a duty which is violated when the majority takes action it is authorized to take which nevertheless operates to the disadvantage of the minority and was not undertaken in good

faith and for a legitimate business purpose. Id. at ¶ 79, citing *Schafer v. RMS Realty* (2000), 138 Ohio App.3d 244, 741 N.E.2d 155.

\* \* \*

Good faith is "defined generally as 'honesty in fact in the conduct or transaction concerned.'" *Casserlie v. Shell Oil Co.*, 121 Ohio St.3d 55, 57, 2009-Ohio-3, 902 N.E.2d 1, at ¶ 10, quoting R.C. 1301.01(S). The Supreme Court of Ohio has also defined the term as follows:

> "'A lack of good faith is the equivalent of bad faith, and bad faith, although not susceptible of concrete definition, embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.'" *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272, 276, 6 OBR 337, 452 N.E.2d 1315, quoting *Slater v. Motorists Mut. Ins. Co.* (1962), 174 Ohio St. 148, 21 O.O.2d 420, 187 N.E.2d 45, paragraph two of the syllabus.

*DiPasquale v. Costas*, 186 Ohio App.3d 121, 2010-Ohio-832, 926 N.E.2d 682, ¶ 122-24, 126-27 (2d Dist.).

{¶ 26} Finally, we note that "[c]ourts in sister states and Ohio appellate courts have

found a heightened fiduciary duty between majority and minority shareholders in a close corporation." *Crosby v. Beam*, 47 Ohio St.3d 105, 108, 548 N.E.2d 217 (1989). As this Court previously noted:

A drawback to the nature of a close corporation is that majority shareholders can easily abuse their corporate control to the disadvantage of the minority shareholders. Minority shareholders are particularly vulnerable because they are small in number and cannot easily protect their financial interests because there is usually no readily available market for their stock. Because of the close relationship between majority shareholders and the actual operation of a close corporation:

"* * * the form is peculiarly susceptible to a particular form of misuse or abuse by the majority or controlling shareholders. Commonly known as a 'squeeze-out' or 'freeze-out,' it refers to manipulative use of corporate control to eliminate minority shareholders * * * or otherwise unfairly deprive them of advantages or opportunities to which they are entitled."_ *Estate of Schroer, supra*, [19 Ohio App.3d] at 37-38, 19 OBR at 103-104, 482 N.E.2d at 978-979, citing O'Neal, "Squeeze-outs" of Minority Shareholders: Expulsion or Oppression of Business Associates (1975).

In response to this problem, numerous courts have "borrowed" a rule from partnership law, and have held that majority shareholders have a

heightened fiduciary duty, one of the utmost good faith and loyalty, to the minority shareholders. *Estate of Schroer*, supra at 37-38, 19 OBR at 103-104, 482 N.E.2d at 978-979. Thus, a majority shareholder's fiduciary duty prohibits him from using his power to promote his personal interests at the expense of corporate interests. *Crosby, supra*, quoting *United States v. Byrum* (1972), 408 U.S. 125, 137, 92 S.Ct. 2382, 2390, 33 L.Ed.2d 238, 247. In *Crosby*, the Ohio Supreme Court held that:

> "Where majority or controlling shareholders in a close corporation breach their heightened fiduciary duty to minority shareholders by utilizing their majority control of the corporation to their own advantage, without providing minority shareholders with an equal opportunity to benefit, such breach, absent a legitimate business purpose, is actionable. (Emphasis added.) *Crosby*, 47 Ohio St.3d at 109, 548 N.E.2d at 220.

*Gigax v. Repka*, 83 Ohio App.3d 615, 620-21, 615 N.E.2d 644, 648 (2d Dist.1992). "Where a partner is expelled in order to resolve a partnership schism, there is no violation of the fiduciary duty." *Leigh v. Crescent Square, Ltd.*, 80 Ohio App.3d 231, 238, 608 N.E.2d 1166, 1171 (2d Dist.1992).

{¶ 27}  As did the trial court, we disagree with Kademian that the evidence at trial was undisputed, such that he was entitled to a directed verdict or to judgment notwithstanding the verdict.  Kademian testified that in April, 2000, Marger "made an

announcement, he and Dr. Rasp." Kademian stated that Marger told him that he was leaving M & A to Kademian, and that Marger assured Rasp at that time that he would "take care of him." Kademian testified that there was no reason to dissolve M & A, and that he later learned in the discovery process that Marger had a plan to practice with Rasp to Kademian's exclusion. Kademian stated that M & A was "not dissolved for any legitimate business purpose." Finally, regarding the Western Ohio stock, Kademian denied that the issue persisted from 1998 to 2000, and he testified that he and Marger "agreed to disagree."

{¶ 28} Conversely, Marger testified that the Western Ohio stock conflict, as well as the issue regarding a possible merger with the Field group, were "very big contentious issues pretty much until the end of the corporation." Marger stated that Kademian's "aggressive" behavior toward hospital staff "couldn't help but somehow affect our relationship with the hospital administrations." Marger stated that he and Kademian were becoming "more and more distanced over a variety of issues, like the peer review." Marger testified that his relationship with Kademian was affecting his health. Marger stated that Kademian's reporting of the treatment of Patient X, after agreeing not to do so without first advising Marger and Rasp, was "the straw that broke the camel's back." Marger testified that he told Rasp and Kademian in April, 2000 that he was leaving M & A, and that at the time he did not know what he wanted to do going forward. Marger stated that he called the shareholders meeting because he thought that was "the cleanest way to disassociate myself from Dr. Kademian." Marger stated that he never intended to retire from the practice of medicine, that he incorporated Cancer Consultants as a "practice vehicle" for himself, and that Rasp was not involved in the process. He stated that he and Rasp subsequently

discussed the possibility of practicing together.

{¶ 29} According to Marger, in mid June, 2000, he realized that if he continued to practice in Dayton, he would also continue to have frequent interactions with Kademian, and that he turned Cancer Consultants over to Rasp at Rasp's request. From July 1, 2000, Marger stated that he "never even set foot in Good Samaritan or Miami Valley again, literally." Finally, Marger stated while Kademian expressed an interest in buying the shares of M & A, and that Marger told his lawyer to look into it, "we just never heard back from Dr. Kademian" about the purchase. He testified that one of the conditions of any sale of M & A to Kademian would be that Kademian would be required to change the name of the entity, since " * * * I honestly did not want my name associated with him - - with his activities anymore."

{¶ 30} Rasp testified that Marger informed him and Kademian that he was leaving M & A, and that Rasp was "stunned" at the news. Rasp denied that Marger stated that he would "take care" of Rasp. Rasp denied that Marger indicated that he was leaving M & A to Kademian. Rasp stated that Kademian told him that he was going to start his own company, and that Rasp was free to do whatever he chose to do after the dissolution.

{¶ 31} We find, based upon the above testimony of Kademian, that there was evidence before the jury that Marger breached his fiduciary duties to Kademian. We further find, based upon the testimony of Marger and Rasp, that there was evidence before the jury that Marger dissolved the business in good faith and for a legitimate business purpose due to the schism that existed between the parties. Accordingly, based upon our thorough de novo review of the record, and without weighing the evidence, we cannot conclude that as a

matter of law, no genuine issues existed for trial. For the foregoing reasons (as well as the reasons set forth in our analysis of Kademian's fourth assignment of error below), we further cannot conclude that the trial court abused its discretion in determining that the judgment is not sustained by the weight of the evidence, or is contrary to law, such that Kademian was entitled to a new trial.

{¶ 32} Regarding Kademian's assertion that the trial court erred in failing to instruct the jury that Marger breached his fiduciary duties, our determination that the trial court did not err in overruling Kademian's motion for a directed verdict renders Kademian's second assigned error moot. Kademian's first three assigned errors are overruled.

{¶ 33} Marger's fourth assigned error is as follows:

"THE JURY'S DETERMINATION THAT DR. MARGER DID NOT BREACH HIS FIDUCIARY DUTIES TO DR. KADEMIAN IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 34} Kademian again asserts that the evidence before the jury was undisputed regarding Marger's breach of his fiduciary duties to him, namely that Marger spoke to Rasp about joining Cancer Consultants without Kademian's knowledge or consent; that Marger had M & A's attorney prepare documents to create Cancer Consultants without Kademian's knowledge or consent; and that, pursuant to a "plan" with Rasp, Marger created the new corporation, without Kademian, to relieve Rasp and himself of the non-competition agreements with M & A, without Kademian's knowledge or consent. According to Kademian, a "review of the record will not disclose *any* evidence to the contrary."

{¶ 35} As this Court recently noted:

The standard set forth for manifest-weight-of-the-evidence appellate review in *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), applies also in civil cases. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17. In applying this standard, the appellate court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983), cited approvingly in *Thompkins* at 387.

*Folck v. Redman,* 2d Dist. Clark No. 2013-CA-35, 2013-Ohio-3646, ¶ 8.

{¶ 36} As this Court has further noted:

* * * The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder,

who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

*Individual Business Servs. v. Carmack*, 2d Dist. Montgomery No. 25286, 2013-Ohio-4819, ¶ 20.

**{¶ 37}** Having reviewed the entire record, weighed the evidence and considered all reasonable inferences, and deferring to the credibility assessment of the jury, we cannot conclude that the unanimous verdict of the jury is against the manifest weight of the evidence. Marger testified, as noted above, that in response to the ongoing dispute regarding the Western Ohio stock, Kademian's conduct regarding Dr. Field, his aggressive behavior toward hospital staff, his conduct regarding peer review, and finally, his reporting of the treatment of Patient X without first discussing it with Marger, he announced his departure from M & A and created Cancer Consultants privately, without Rasp's involvement, so that if he chose to continue to practice in Dayton, he could do so. Rasp's testimony supports Marger's, as does Martin's regarding Kademian's treatment of hospital staff. The jury was free to credit Marger's testimony regarding his motives in dissolving M & A, namely that it was no longer feasible or functional for him and Kademian to continue as partners, and that, based upon Kademian's conduct, a schism existed between Marger and Kademian. If believed, the jury had ample basis to conclude that Marger dissolved the business in good faith and for a legitimate business purpose, and that he did not breach his fiduciary duty to Kademian in doing so. Since Kademian's fourth assignment of error lacks merit, it is overruled.

**{¶ 38}** We will consider Kademian's fifth and sixth assigned errors together. They

are as follows:

"THE TRIAL COURT ERRED IN ALLOWING EVIDENCE OF DR. KADEMIAN'S ALLEGED ALIENATING ACTIONS CONCERNING THE APPOINTMENT OF DR. DOUG DITZEL AS THE MEDICAL DIRECTOR OF MIAMI VALLEY HOSPITAL."

And,

"THE TRIAL COURT ERRED IN NOT INSTRUCTING THE JURY THAT SUBSEQUENT ACTIONS BY A PLAINTIFF ARE NOT A DEFENSE TO A CLAIM FOR BREACH OF FIDUCIARY DUTY."

{¶ 39} Kademian asserts as follows in his brief:

Dr. Kademian filed a motion in limine to exclude any subsequent actions on December 6, 2012. Counsel for Kademian objected to such evidence again at trial and was twice granted a continuing objection to such evidence by the trial court. * * * Nevertheless, the trial court allowed evidence by Dale Creech, Gregory Rasp, Rebecca Paessun, Doug Ditzel and Mary Boosalis that Dr. Kademian caused his own demise subsequent to Dr. Marger's wrongful dissolution of [M & A]. * * * The trial court allowed this evidence because "it goes to damages."

{¶ 40} Kademian further asserts that in "addition to erring by allowing evidence of actions by Dr. Kademian subsequent to the breaches of fiduciary duty by Dr. Marger, the trial court also erred by not providing a requested instruction that such subsequent actions by a plaintiff are not a defense to breach of fiduciary duty."

**{¶ 41}** We initially note that the "decision whether to admit or exclude evidence is within the sound discretion of the trial court, and 'unless the trial court clearly abused its discretion and a party was materially prejudiced as a result, reviewing courts should be slow to interfere.' *King v. Niswonger*, 2d Dist. Darke No.2013-CA-1, 2014-Ohio-859, ¶ 12, quoting *Waste Mgt. of Ohio, Inc. v. Mid-America Tire, Inc*., 113 Ohio App.3d 529, 533, 681 N.E.2d 492 (2d Dist.1996)." *Walsh v. Smith*, 2d Dist. Montgomery No. 25879, 2014-Ohio-1451, ¶ 16.

**{¶ 42}** The record reflects that on December 6, 2012, Kademian filed a motion entitled "Plaintiff's Motion in Limine to Exclude Subsequent Actions of the Plaintiff as an Intervening, Superceding Cause of Damages." The motion provides as follows:

> * * * while the Defendant has requested an instruction regarding an intervening, superceding cause pursuant to OJI 405.05, under Ohio law, an intervening superseding causation only relates to actions by third parties, not the Plaintiff. Where a Defendant raises the actions of the Plaintiff as a defense to the Defendant's wrongdoing, he is raising the issue of comparative or contributory fault which is not permitted under Ohio law for intentional torts.

**{¶ 43}** On December 7, 2012, Marger filed a response which provides in part that "Defendant agrees to withdraw this requested instruction," and that Kademian's motion is accordingly moot.

**{¶ 44}** At trial, on December 14, 2012, in the course of the direct examination of Dale Creech regarding the selection process for the medical director or doctors to replace the

Field group, the following exchange occurred:

Q. Do you know in terms of Miami Valley or Premier recruiting for the medical director for radiation oncology at the Valley how that took place?

A. Not really.

* * *

A. That was not - - my job would be to do any contracts that resulted from the recruiting, not to be really involved in the recruiting process itself.

Q. * * * Do you know if Mary Boosalis would be involved however in the process of the selection of medical director or doctors to fill the position left by the leaving Field group?

A. Yes, she would have been very involved.

Q. Did you become aware after this period - - you've got Rasp, Kademian, Paessun, Ditzel?

A. Yes.

Q. Did you become aware of a subsequent issue or problem with Dr. Kademian?

A. Yes. T.T. pg. 357.

{¶ 45} Kademian objected as follows: "* * * This is just a back door way of trying to introduce an intervening superseding cause. * * * He withdrew his request for instruction on intervening superseding cause. Then he went before the jury in the opening statement and said Dr. Kademian cause his own demise. Now that's where we're going with this and it's not relevant." T.T. pg. 358. The following exchange occurred:

MR. GORA: Your Honor, this goes to damages. And this is the intent of what the other players with the hospital was going to do (sic), that he was going to be part of this group that was going to be - - * * *.

THE COURT: Uh-huh.

MR. GORA: It was going to be business as usual and everything was going to be the same except he's the one who caused this whole problem. So he absolutely - -

THE COURT: I agree it goes to damages. Certainly not intervening superseding, but.

MR HILL: I'm going to request a limiting instruction that it not be considered an alternative cause.

THE COURT: Well, I will certainly give that instruction, but I do think it goes to damages. So they'll be instructed that his behavior is not - - can't cause a breach of fiduciary duties. And that's really clear. * * *

MR. HILL: Okay.

THE COURT: And I'll instruct them that. They can consider this testimony only as it relates to damages.

MR. HILL: Thank you.

* * *

MR. GORA: * * * Your Honor, one of the reasons we received a directed verdict last time is we didn't benefit from the dissolution. Everybody had a level playing field. I think we still have to show that

element too in terms of breach of fiduciary duty, that we weren't involved, that these contracts had nothing to do with us, how that happened.

THE COURT: But the breach of fiduciary duty was the dissolution of the corporation, not what happened subsequently in terms of whether he did or didn't get this contract. That's my understanding.

MR. HILL: That's exactly right. And the Court of Appeals has said that he didn't have to benefit from it for it to have to be breach of fiduciary duty. That was the issue on appeal.

MR. GORA: That's correct, Your Honor, but except the Court of Appeals said it's not just that. It's other things too. Did he have some ill will? Was there a reason for this to happen? But I think it's also important to reaffirm based on the case law that indeed too why these contracts didn't or why Dr. Kademian wasn't part of these contracts had nothing to do with us and how that happened.

THE COURT: But that's only a damage issue. It is not a breach of fiduciary duty issue. That's only - - from the Plaintiff's theory of the case, the breach of fiduciary duties had already occurred or had occurred in the dissolution of the corporation. And the - - I'm just going to use your words - - the plan to set up Cancer Consultants and practice without Plaintiff involved. So I think this goes to damages only. * * * T.T. pg. 358-61.

Counsel for Kademian then requested and received a continuing objection. T.T. pg. 361.

{¶ 46} Creech then testified as follows regarding Doug Ditzel:

* * * As the hospital began to announce that it had recruited Dr. Ditzel and Dr. Paessun to come practice radiation oncology at the hospital, and I don't remember who announced that Dr. Ditzel was going to become the new medical director of radiation oncology. And Dr. Kademian took exception to that appointment and entered into kind of a letter writing campaign to Premier and hospital board members, medical staff, I can't remember all who. * * * Where he basically maligned the hospital's decision to appoint Dr. Ditzel and attacked Dr. Ditzel's qualifications to be medical director.

And that was kind of the last straw. The hospital didn't take kindly to that attack and did not want to allow Dr. Kademian to practice. And of course Dr. Ditzel then didn't want to have Dr. Kademian in any kind of group that he was going to be in after having his qualifications assailed. T.T. pg. 362.

{¶ 47} Paessun's testimony was consistent with that of Creech regarding Kademian's conduct toward Ditzel. Ditzel testified that he perceived Kademian's conduct "as a threat," and that he did not want to work with him. T.T. pg. 425, 429. Rasp testified that in July, 2000, he spoke to Kademian "about putting this four person group together with him and myself, Dr. Paessun and Dr. Ditzel." T.T. pg. 528. When asked if he was an advocate for Kademian being part of the group at that time, Rasp responded, "Absolutely." T.T. pg. 528. Rasp stated that after Kademian disparaged Ditzel, "there was no chance" of Kademian becoming part of the group. T.T. pg. 541. Finally, Boosalis testified that she met with Kademian after he sent a letter dated August 1, 2000 to Bill Thornton, the CEO of

Miami Valley Hospital, that disparaged Ditzel.  When asked to describe her meeting with Kademian, Boosalis replied that it "was very similar to this letter.  He was very upset, I would say, very animated, very accusatory, made, my opinion, quite a few defamatory remarks - - ."  T.T. pg. 452.  Boosalis stated, "I asked [Kademian] if he knew Dr. Ditzel or had worked with him, and he had not which I found rather astounding.  He had a very strong bias that because Dr. Ditzel's program was not what he considered the caliber of his program had been, * * * I believe Dr. Ditzel did a D.O. residency and was a D.O.  He was extraordinarily critical of that and thought it disqualified him in essence to be the medical director."  T.T. p. 452-53.

{¶ 48}    We cannot conclude that the trial court abused its discretion in admitting the evidence at issue, namely Kademian's conduct following the breach of fiduciary duties that he alleged Marger committed.  As noted above, if a plaintiff establishes that a defendant breached his fiduciary duty, the plaintiff must then establish that the breach proximately caused his damages.  As this Court noted in *Kademian I*, "Proximate cause is ordinarily a question of fact for the jury.  *Strother v. Hutchinson*, 67 Ohio St.2d 282, 288, 423 N.E.2d 467 (1981)." Id., ¶ 70.  In *Strother*, the Supreme Court of Ohio noted when discussing proximate cause, that "'it is generally true that, where an original act is wrongful or negligent and in a natural and continuous sequence produces a result which would not have taken place without the act, proximate cause is established * * * .' * * * . *Foss-Schneider Brewing Co. v. Ulland* (1918), 97 Ohio St. 210, 119 N.E. 454." *Strother*, 287.

{¶ 49}   The theory of Kademian's case, as reflected in his brief, was that Marger

breached his fiduciary duties to him in dissolving M & A, proximately "causing Dr. Kademian to lose his shareholder interest, his employment and *effectively preventing him from practicing medicine in the Dayton, Ohio area.*" (Emphasis added). While Kademian asserted that the testimony of Creech, Rasp, Paessun, Ditzel and Boosalis was irrelevant, the trial court correctly determined that it was in fact relevant to a determination of damages, should the jury conclude that a breach of fiduciary duties occurred. Since an abuse of discretion is not demonstrated, Kademian's fifth assigned error is overruled.

{¶ 50} As to the trial court's jury instructions regarding Kademian's subsequent actions, we note that at the charging conference the following exchange occurred:

THE COURT: * * *

Plaintiff also requests an instruction as follows. "All of the claims by Dr. Kademian against Dr. Marger are claims for intentional torts. Any action by Dr. Kademian subsequent to any breach of fiduciary duty or" * * * "or [conversion] by Dr. Marger are no defense to such intentional torts."

Mr. Gora, any objection?

MR GORA: Yes, Your Honor. That again goes toward - - we've already defined what the claims are, what you have to prove for it. Now he wants another claim about what - - these are intentional torts and that his actions don't matter. And they do, in terms of both proximate cause and damages. We've already been through that at least five to ten times.

* * *

THE COURT: I am not going to include the instruction about

intentional torts and that Dr. Kademian's subsequent actions are no defense to such intentional torts,* * * . I - - as I have said before, I think it goes to proximate cause.

{¶ 51}  The record reflects that the trial court instructed the jury in part as follows:

* * *

A majority shareholder is also prohibited from using his majority power to promote his personal interest at the expense of the corporation's interest.  It does not matter whether Dr. Marger personally benefitted from any breach of fiduciary duties.  Any actions by Dr. Kademian subsequent to breach of fiduciary duty is no defense to any breach of fiduciary duty.

If you find by a preponderance of the evidence that Defendant, Dr. Marger, violated any fiduciary duty to Plaintiff, Dr. Kademian, you will consider whether any such violation of fiduciary duty proximately caused damage to Plaintiff, Dr. Kademian.

* * *

{¶ 52}  Preliminarily, we note that the trial court correctly set forth the elements of Kademian's claims, and contrary to Kademian's assertion, the trial court, after indicating that it would not provide the instruction that Kademian's subsequent actions are not a defense to a claim of breach of fiduciary duty, did in fact provide an instruction regarding the subsequent actions of Kademian.  Thus, Kademian misstates the record on this issue.  Accordingly, his sixth assigned error lacks merit, and it is overruled.  The judgment of the trial court is affirmed.

. . . . . . . . . .

HALL, J., and WELBAUM, J., concur.


Copies mailed to:

James M. Hill
Felix J. Gora
Hon. Mary K. Huffman